|     |     |
| --- | --- |
| **UNITED STATES DISTRICT COURT** | |
| **DISTRICT OF NEVADA** | |
| United States of America, | Case No.: 2:16-cr-00111-JAD-CWH |
| Plaintiff | **Order Denying Defendant's Motion for a New Trial** |
| v. | |
| Craig P. Orrock, | [ECF No. 260] |
| Defendant | |

Defendant Craig Orrock is a former attorney who worked for the Internal Revenue Service (IRS) for several years after graduating law school and spent the bulk of his career as a sole practitioner specializing in tax law. After a five-day trial, a jury found him guilty of two counts of evasion of payment and assessment of tax and one count of attempt to interfere with administration of internal revenue laws. The convictions stem from Orrock's long history of concealing his income by reporting false information to the IRS and moving funds through—as one testifying agent described it—an extensive "spider web" of bank accounts belonging to his many businesses, faux businesses he created in the name of his then-wife, and a trust ostensibly for the benefit of their children. When the IRS began to audit Orrock and attempted to later levy his accounts, he interfered with these efforts by continuing to maneuver funds through this web, falsely reporting to the IRS as part of a compromise offer he submitted that he had almost no assets, and filing a series of frivolous bankruptcy petitions to invoke the Bankruptcy Code's automatic stay of all collection efforts.

Orrock now moves for a new trial, arguing that the weight of the evidence doesn't support the jury's verdict. But the government presented a compelling case, consisting of a mountain of documents and testimony from Orrock's ex-wife, individuals involved in the

transactions that resulted in more than a million dollars in income that he didn't report, and an IRS forensic fraud examiner who summarized this information for the jury as an expert witness. This evidence was comprehensive, credible, and overwhelming. I therefore deny Orrock's motion.

**Standard of Review**

Under Federal Rule of Criminal Procedure 33, a district "court may vacate any judgment and grant a new trial if the interest of justice so requires."[1] The "power to grant a motion for a new trial is much broader than [the] power to grant a motion for judgment of acquittal" under Rule 29.[2] And unlike an acquittal motion, a district court ruling on new-trial motion "need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses."[3] Nonetheless, a new trial should be granted "only in exceptional cases, where the evidence weighs heavily against the verdict."[4]

**Discussion**

**I.  The government's nominee theory was amply supported at trial.**

Before turning to the evidence that supported each charge, I first address one of the central theories underlying the government's case: that Orrock's many business entities were

---

[1] Fed. R. Crim. P. 33(a).

[2] *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992).

[3] *Id.* (citation omitted). At the end of the government's case-in-chief, Orrock orally moved for acquittal under Rule 29, which I denied. ECF No. 264 (Trial Day 4 minutes). Although Orrock does not renew his Rule 29 motion along with his post-trial Rule 33 motion, the government incorrectly cites to the narrower sufficiency-of-the evidence standard, which assesses "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); ECF No. 272 at 10‒11.

[4] 3 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 582 (4th ed. 2019); *accord United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981).

2

nominees and that the income earned by these entities was therefore attributable to Orrock individually. Orrock argues—as he did during closing—that the IRS did not apply a nominee theory while auditing him and that the government's expert witness during trial arbitrarily deemed his companies as nominees without properly relying on IRS regulations.

But Orrock misrepresents the trial testimony. For instance, Revenue Officer Desiree Harkema, who began efforts in 2011 to collect on Orrock's outstanding tax bill, described a spider web of bank accounts controlled by Orrock and testified that, during her nearly 30-year career, she had never seen an individual with more accounts.[5] And during Orrock's cross examination, Harkema stated that she believed his corporations were nominees and that he went to great lengths to conceal his assets using these entities. When Orrock asked why she never used nominee liens to collect on his individual liability through his business entities, Harkema explained that, by the point that the fraudulent nature of Orrock's outstanding taxes came into full focus, the case was referred for criminal investigation, requiring her to close the IRS's civil proceedings against him.[6] Indeed, the fraud referral memorandum in 2012 lists "Concealment of Assets through Nominees" as one of Orrock's affirmative acts of fraud, highlighting the many accounts he controlled.[7]

---

[5] Because this case is not yet ripe for appeal and Orrock has therefore not ordered official trial transcripts, I rely on my extensive notes of trial testimony and the unofficial rough transcripts produced by the court reporter.

[6] Orrock has accused the government of vindictive prosecution and prosecutorial misconduct by allegedly using IRS civil proceedings to build the criminal case against him. This issue was thoroughly litigated before trial, *e.g.*, ECF No. 86, and I precluded Orrock from raising this theory at trial. I nonetheless had to admonish him numerous times during his cross examinations and his closing argument, and he again wades into this topic in his new-trial motion. I decline to address this issue again or to consider it in weighing the credibility of the government's witnesses.

[7] Gov. Exh. 48.

Revenue Agent Laura Blado, the certified fraud examiner who served as the government's expert witness, also testified extensively and effectively about Orrock's nominees. She explained that a nominee is an entity used to disguise the ownership of an asset. Orrock highlights the fact that Blado could not cite the specific portion of the IRS manual addressing nominees during his cross examination of her, asserting that "she pretty much assumed [his companies] were nominees for purposes of her calculations and didn't need to investigate further."[8] But although Blado testified that she didn't consult the IRS manual or code in preparing for her testimony specifically, she clarified that she was familiar with the term through her work. Tellingly, the nominee definition from the IRS manual that Orrock advances in his new-trial motion is highly comparable to Blado's paraphrasing during trial.[9] And contrary to Orrock's assertion that Blado's use of the nominee theory is unfounded, she also testified extensively about the flow of funds through Orrock's many entities and his personal use of these assets. She also supported her testimony with charts that effectively summarized this information for the jury and were admitted into evidence.[10]

In contrast, Orrock didn't present any evidence at trial that refuted the government's nominee theory. He instead attempted to demonstrate that at least two of his entities, Great White Investments and Competition Grand Prix, were legitimate businesses. Orrock argued adamantly throughout his closing that Great White helped return nearly $1 million in investments to victims of Ponzi schemes. But putting aside the fact that the government's

---

[8] ECF No. 260 at 3.

[9] *Id*. at 18 (quoting the IRS manual: "The nominee theory is based upon the premise that the taxpayer ultimately retains the benefit, use or control over property that was allegedly transferred to a third party. Thus the nominee theory focuses on the relationship between the taxpayer and the transferred property").

[10] *E.g.*, Gov. Exhs. 180–84.

4

evidence showed that Orrock was revictimizing some of the same individuals he claims to have aided,[11] Orrock's primary argument is a straw man because Blado testified that a nominee entity can have a legitimate business operation. The crux of the nominee theory is that an individual retains the benefit of assets held in the name of another entity or individual in order to avoid tax obligations. And as discussed in more detail below, the evidence at trial demonstrated that Orrock used the funds in his many business accounts and his children's trust accounts for personal expenses, such as dining and travel. It was thus reasonable for the jury to conclude that much of the funds flowing through Orrock's entities constituted personal income, thus creating a tax liability that he failed to pay.

**II.     Counts one & three: evasion of payment of income tax and attempt to interfere with administration of internal revenue laws**

Because counts one and three are largely related, I address them together, beginning with an overview of their overlapping facts.

**A.     Background**

Orrock has a long history of not paying his taxes.[12] Each year between 2000 and 2006, Orrock filed a tax return that self-assessed an amount of taxes due, ranging from $2,500 to almost $38,000.[13] But Orrock paid only a miniscule amount of this tax bill and attempted in multiple ways to avoid the obligation. In 2009, for instance, he filed a personal income-tax

---

[11] For example, the government introduced a letter into evidence that Orrock sent to investors of a Ponzi scheme asserting that they had received funds they were not entitled to, stated that they had been sued in an action brought by an unnamed client, and offering to settle the matter in exchange for $5,000 or a 10% interest in their original investment. Gov. Exh. 178.

[12] Although count one address only 2000–06, Orrock owed back taxes each year going back to at least 1993. Gov. Exh. 186. But because of the 10-year time bar on collections, the IRS eventually wrote off much of the taxes Orrock owed in the 1990's.

[13] Gov. Exh. 179.

5

return for 2008 claiming a $440,000 theft-loss deduction stemming from an expansive Ponzi scheme known as VesCor Capital.[14] Orrock then filed amended returns for 2004 through 2006, seeking to claim the remainder of the loss in excess of his 2008 tax obligation as deductions for these prior years—thereby ostensibly wiping out his tax debt for those years.[15] After the IRS eventually began auditing these four years of returns in 2010, Revenue Agent Patrick Von Ahn contacted Jared Parrish, the attorney for the receivership established by court order after the Securities and Exchange Commission (SEC) initiated an action against the VesCor entities. Parrish informed Von Ahn in early 2012 that Orrock was never an investor in VesCor.[16] Parrish also provided a copy of a cease-and-desist letter that he had sent Orrock several years earlier after Orrock began claiming that VesCor investment victims had assigned their claims to him.[17] The letter, sent in October 2008, informed Orrock that the SEC did not recognize assigned claims in a receivership and that some of his actions violated the court order establishing the receivership.

In April 2010, Orrock submitted an Offer in Comprise (OIC) form to the IRS, offering to settle his outstanding tax obligation for tax years 2000–07 and 2009 for just $25,000.[18] In the section asking Orrock to explain his circumstances, he wrote: "I am 63 years old this year and

---

[14] *See Adkins v. United States*, 113 Fed. Cl. 797, 802 (2013) ("Pursuant to section 165 of the Internal Revenue Code ('IRC') and its implementing regulations, taxpayers are permitted to deduct a theft loss from their income in the year that they discover the loss, so long as they have not been compensated for the loss and so long as they do not have a claim for reimbursement for which they have a reasonable prospect of recovery.").

[15] *E.g.*, Gov. Exh. 16 (Tax year 2006 return, including Form 1040X amended return stating as reason for change: "Carryover from Ponzi Loss Scheme incurred in 2008 pursuant to Revenue Procedures 2009-20 and Revenue Ruling 2009-9").

[16] Gov. Exh. 176.

[17] Gov. Exh. 177; *see also supra* note 11.

[18] Gov. Exh. 30.

6

filed bankruptcy a few years ago. My income has declined due to the Nevada economy[,] and my health has been marginal[,] which limits the amount of time I can work." And in the following section asking Orrock to specify his "source of funds," he wrote: "From paycheck each month. I just started a new job."

As part of his OIC, Orrock also submitted a Form 433-A, which asks more probing questions about a taxpayer's income and assets.[19] Under a section asking for employment information, Orrock listed Great White NV, Inc. as his employer, representing that he had worked for this entity for only one month and received bi-weekly paychecks. That same section directed Orrock to complete two subsequent sections if he or his spouse was self-employed, but Orrock left both sections blank. The next section asked Orrock whether he was a beneficiary of a trust, to which he answered no. And under sections asking about Orrock's assets, he listed only $200 in cash on hand, $700 in checking, personal items he valued at $500, and two cars he valued at a combined $7,500. One subsection asked about any investments Orrock held, instructing him in bold font to "[i]nclude all corporations, partnerships, limited liability companies[,] or other business entities in which [he] is an officer, director, owner, member, or otherwise has a financial interest . . . ." Orrock listed stock in "Pro-Brokers Inc." and "GWI," but listed both entities as "defunct" and thus claimed $0 in equity. Orrock signed both the OIC and the attached 433-A under penalty of perjury. Later that year, the IRS returned the OIC to him, explaining that it could not consider his offer while "other investigations"—i.e., the audits of him—were pending because the result could affect his tax liability.

As the audit of Orrock progressed, the IRS also attempted to collect on his outstanding tax obligation. Days after Revenue Officer Harkema sent Orrock a notice of intent to levy on his

---

[19] *Id*.

bank accounts in April 2011, he filed a bankruptcy petition, which caused an automatic stay of all enforcement efforts under the Bankruptcy Code.[20] But Orrock never participated in the bankruptcy proceedings, so the petition was dismissed several months later. Harkema therefore resumed collection efforts, and Orrock eventually filed two new bankruptcy petitions in November 2011 and May 2012, triggering anew the automatic stay. Those petitions, too, were ultimately dismissed after Orrock again failed to participate in proceedings. The grand jury indicted Orrock in 2016.

### B. Ample evidence demonstrated that Orrock submitted a falsified offer in comprise and concealed the sources and size of his income through a web of nominee bank accounts.

Count one charged Orrock with evasion of payment of tax under 26 U.S.C. § 7201, which required the government to prove: (1) "the existence of a tax deficiency"; (2) "an affirmative act constituting an evasion or attempted evasion of the tax"; and (3) that Orrock acted willfully.[21] "A tax deficiency occurs when a defendant owes more federal income tax for the applicable tax year than was declared due on the defendant's income tax return"[22] or when a defendant fails to pay the tax that he declares.[23] A defendant acts willfully when he "knew federal law imposed a duty on" him and "intentionally and voluntarily violated that duty."[24] The Supreme Court has instructed that an

> affirmative willful attempt may be inferred from conduct such as
> keeping a double set of books, making false entries of alterations,
> or false invoices or documents, destruction of books or records,

---

[20] 11 U.S.C. § 362.

[21] *United States v. Kayser*, 488 F.3d 1070, 1073 (9th Cir. 2007).

[22] *Id*.

[23] *See* 26 U.S.C. § 7201 (making it a crime to "willfully attempt[] in any manner to evade or defeat any tax imposed by this title or the payment thereof").

[24] Ninth Cir. Crim. Jury Instr. 9.42 (2019 update).

8

> concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.[25]

Conversely, a good-faith misunderstanding of the law negates willfulness.[26] The defendant's belief need not be objectively reasonable to be held in good faith, but the jury can consider any admissible evidence in assessing whether the defendant knew of his legal duty to pay a certain amount of tax.[27]

Court three charged Orrock with attempt to interfere with administration of internal revenue laws. Under 26 U.S.C. § 7212(a), it is a felony to "corruptly or by force . . . endeavo[r] to obstruct or imped[e] the due administration" of the Internal Revenue Code. "An act is 'corrupt' . . . if it is performed with the intention to secure an unlawful benefit for oneself or for another."[28] The government must establish "a 'nexus' between that act and a particular administrative proceeding, such as an investigation, an audit, or other targeted administrative action. That nexus requires a 'relationship in time, causation, or logic with the [administrative] proceeding.'"[29] An administrative proceeding or action "does not include routine, day-to-day work carried out in the ordinary course by the IRS, such as the review of tax returns."[30] The

---

[25] *Spies v. United States*, 317 U.S. 492, 499 (1943).

[26] Ninth Cir. Crim. Jury Instr. 9.42.

[27] *Cheek v. United States*, 498 U.S. 192, 202–03 (1991).

[28] *United States v. Hanson*, 2 F.3d 942, 946 (9th Cir. 1993).

[29] *Marinello v. United States*, 138 S. Ct. 1101, 1109 (2018) (quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995)).

[30] *Id.* at 1110 ("Just because a taxpayer knows that the IRS will review her tax return every year does not transform every violation of the Tax Code into an obstruction charge.").

9

defendant must also "act with knowledge or [have] reason to know of a pending or imminent IRS proceeding, such as an IRS audit."[31]

The government argued in closing that much of Orrock's conduct that constituted tax evasion also satisfied the elements of attempt to interfere with administration of internal revenue laws and that both charges largely centered on the falsehoods and omission that Orrock included in his OIC. Although Orrock submitted the OIC in 2010 based on his claim that he had insufficient assets to pay his tax debt in full, the government convincingly demonstrated that Orrock received substantially more income that year than he reported on the OIC and had access to significant unreported assets.

For instance, Orrock's firm, Great White NV, received a wire transfer from a company called Silar for $25,000 for "services and fees rendered" in April 2010—the same month that Orrock submitted the OIC—and ultimately received a total of almost $240,000 from Silar that year.[32] Though Orrock contends that such income is attributable to his company rather than to him as an individual, the jury could, as discussed above, have reasonably concluded that Great White NV was one of Orrock's many nominees and that he personally benefitted from these funds. Indeed, the evidence at trial showed that, although Orrock had been operating for years through his company "Great White Investments"—which he declared "defunct" on his OIC—he registered "Great White NV" with the Nevada Secretary of State just two weeks before submitting the OIC and then issued himself a paycheck. Because the evidence at trial showed that Orrock was the sole owner/manager of his many companies and that he reported only

---

[31] *United States v. Beckham*, 917 F.3d 1059, 1065 (8th Cir. 2019) (citing *Marinello*, 138 S.Ct. at 1104).

[32] Gov. Exh. 97. Similarly, Iain Finlayson, who testified at trial, issued Great White NV a check for more than $9,300 for "tax work" days before Orrock submitted his OIC.

10

business income—and no W-2 income—on his 2010 income-tax return, it was reasonable for the jury to conclude that Orrock created Great White NV to conceal the sources and size of his income. Similarly, it was reasonable to conclude that Orrock intentionally failed to complete the sections asking about his business assets for the same reason.[33]

Another critical misrepresentation in the OIC involves the trust fund Orrock ostensibly created for his children. Although he stated on Form 433-A that he was not the beneficiary of a trust, the evidence at trial demonstrated that the funds in his children's trust largely went to benefit Orrock personally. Indeed, Orrock withdrew over $100,000 from the trust in 2010 alone, and the government demonstrated that much of these funds were spent on personal expenses, including dining, bars, travel, gas, and goods. But Orrock reported meager assets on his form totaling only a few thousand dollars in cash and goods. He asserts that he held funds in this trust and transferred money to his then-wife's accounts because unspecified parties were threatening his life at the time and that he was attempting to safeguard assets for his family rather than avoid tax obligations.[34] Orrock made similar vague assertions before and during trial,[35] but he hasn't explained how the alleged threats are relevant to any of the three counts. I assume that he offered them to undermine the conclusion that he acted willfully or corruptly under counts one and three, respectively. But Orrock presented little evidence at trial about the alleged threats; he chose not to testify and merely asked his ex-wife during cross examination whether his life was threatened during their marriage, without any further factual development. And regardless,

---

[33] An analysis of the many bank accounts that Orrock controlled revealed that, during the month he submitted the OIC, he made deposits totaling over $75,000 and withdrew over $70,0000. Gov Exh. 183.

[34] ECF No. 260 at 19 n.12.

[35] *E.g.*, ECF No. 177 at 6–7 (Orrock's response to the government's omnibus motions in limine).

11

Orrock's explanation is incredible because it doesn't address why concealing assets from the IRS would further a plan to safeguard these assets from these phantom menaces.

Beyond the OIC, there was also evidence that Orrock attempted to evade taxes and obstruct the audit and collection efforts by shifting the flow of money through his web of nominee bank accounts. For instance, the evidence at trial showed that, beginning in late 2011, the company Silar began making wire transfers totaling nearly $190,000 to Competition Grand Prix, Orrock's go-kart facility.[36] While being cross examined by Orrock, Robert Leeds, Silar's principal, testified that he or Silar were investors in Competition Grand Prix and may have also routed settlement funds designated for third parties through the go-kart company. Orrock hardly touched on this testimony during his closing argument, but the obvious intended implication was that, unlike the wire transfers in 2010, the 2011–12 transfers were not consulting-fee payments to Orrock and therefore weren't income that he was attempting to conceal through Competition Grand Prix. But the government convincingly argued that this conclusion was not plausible because Leeds testified that Silar had formalized business practices and followed Generally Accepted Accounting Principles—and yet there were no records demonstrating that this flow of funds to Competition Grand Prix was anything other than payments to Orrock and no explanation for why sophisticated Silar would invest in a go-kart track in Las Vegas.

The government also presented the jury with spreadsheets summarizing the cash flow through accounts held by Orrock's then-wife Valerie. Although she had originally been depositing checks issued by Great White NV and Pro-Brokers,[37] the checks began coming almost

---

[36] Gov. Exh. 175. The payments were made by Silar's attorney, Frank Majorie, who testified at trial that he wired the money from his firm's trust account for Silar.

[37] Although Orrock declared Pro-Brokers defunct on his OIC in April 2010, he was issuing checks to his wife from that account into at least early 2011—further demonstrating his attempt to conceal his assets on the OIC.

12

exclusively from Competition Grand Prix around the same time that the company began receiving wire transfers from Silar.[38] It was therefore reasonable for the jury to conclude—as the government argued at closing—that Competition Grand Prix was merely another strand in Orrock's vast web of nominees that he was using to conceal his income from the ongoing IRS audit and collection efforts.

Finally, Orrock makes much of the theft-loss deduction stemming from the VesCor Ponzi scheme that the IRS ultimately denied, arguing that he was gifted an assigned claim by a VesCor investor named Garn Ford. Orrock again fails to tie this argument to an element of any of the counts, but I assume that he seeks to demonstrate that he claimed the deduction in good faith and therefore did not *willfully* evade his taxes. But the jury heard almost nothing about this purported assignment, as Orrock gave notice shortly before trial that Mr. Ford had passed away. Orrock merely asked Parrish, counsel to the VesCor receivership, whether Ford was on the list of VesCor investors, and Parrish responded that he would have to double check the records. And when Orrock asked Parrish whether an assignee steps into the shoes of an assignor, I sustained the government's objection that the question called for a legal conclusion.

But even if the jury had learned more about the purported assignment—or assumed that it occurred based on Orrock's questions—it was reasonable for them to conclude that Orrock did not claim a theft loss based on a good-faith misunderstanding of how that deduction works. Parrish's testimony established that he informed Orrock in 2008—almost a year before he submitted the returns claiming the deduction—that the SEC did not recognize the assignments. Although the SEC's position on a receivership is not dispositive of the validity of a tax

---

[38] Valerie Orrock also testified that Orrock directed her to create the various accounts and completed her yearly tax returns, on which he would forge her signature.

13

deduction, this exchange would have placed Orrock on notice that his purported assignment may not be valid. And even though an unreasonable belief does not negate good faith, the jury could validly have relied on the fact that Orrock was a long-time tax attorney and former IRS employee in concluding that he claimed the deduction in bad faith and thus acted willfully.[39] Accordingly, there was ample evidence supporting the jury's guilty verdicts for counts one and three, and I deny Orrock's motion as to these convictions.

### III. Count two: evasion of assessment of tax

#### A. Background

Count two stems from the sale of a parcel of real property in Las Vegas referred to at trial as the Arville Property. The property was originally owned by Bertha and Joel Astorga, who fell behind on their tax obligations and risked losing the property. In 2001, Orrock brokered a deal in which the Astorgas sold the land to Roger Thompson, a business associate of Orrock's who invested in various ventures with him. At trial, Thompson testified that, as Orrock originally presented the deal, the land would ultimately cost him $375,000 but would initially be conveyed to him for a down payment of $80,000 while the Astorgas negotiated with the IRS over their tax debt.[40] Admitting that he didn't understand the details, Thompson also testified that Orrock later informed him that the terms of the deal had changed and that $80,000 would be the property's total purchase price, resulting in Thompson acquiring full and sole interest. Indeed, the final

---

[39] *See United States v. Smith*, 890 F.2d 711, 715 (5th Cir. 1989) (citing to the defendant's "acumen as an entrepreneur" in finding that the government sufficiently showed that the defendant willfully evaded his taxes by "filing and signing a return reflecting a negative income in excess of $10,000 when in truth and in fact the proper income experienced by the taxpayer exceeded $88,000").

[40] *See* Gov. Exh. 96 (supplemental closing agreement).

deed of sale recorded with the county shows the Astorgas conveying the Arville Property to Thompson in July 2001 for $80,000.[41]

The following year, Thompson, on Orrock's advice, transferred title to the Arville Property to "Arville Properties, LLC," a company that Orrock created and solely managed through a separate Orrock-owned entity, ACPO Development, Inc. In 2005, Orrock took out two loans totaling over $450,000 in the name of Arville Properties from a hard-money lender. The loans were secured by a deed of trust on the Arville Property. Orrock only ever made interest payments on the combined loans using Arville Properties funds but never made payments to reduce the principal.

In 2007, Orrock negotiated the sale of the property to an adjacent business for $1.5 million. Orrock brokered the deal through his brokerage firm Pro-Brokers, Inc.,[42] taking a $45,000 commission. Once the sale was complete, Orrock repaid the $450,000 loans from escrow and then deposited over $928,000—the remainder of the sale proceeds after the loan repayments, broker's commission, and closing costs—into the Arville Properties bank account. Thompson testified at trial that, after the sale, he met with Orrock, who presented with him a sheet showing the final distribution of sale proceeds.[43] Although Thompson had expected to receive the full $1.5 million minus the commission and closing costs, the sheet showed him being allocated just one-third of the $928,000 post-loan repayment "net proceeds." The sheet also deducted from Thompson's share $175,000 to pay off a judgment entered jointly and severally against Thompson and Pro-Brokers and resulting from a Nevada civil suit involving a

---

[41] Gov. Exh. 89 (deed conveying Arville Property to Thompson for $80,000).
[42] Orrock was a licensed real-estate broker in Nevada.
[43] Gov Exh. 93.

different venture.[44] According to this calculation, Thompson was entitled to only about $134,000, which Orrock eventually paid out to him from the Arville Properties account after holding those funds for a short time in a certificate of deposit.[45]

Thompson testified at trial that he was unaware of the loans against the property and that Orrock never explained their purpose during their meeting. As for the remainder of the net proceeds, Orrock explained that they were equally allocated in thirds between himself, Thompson, and the Astorgas. Thompson testified that he did not understand why the sale proceeds were distributed, as he believed he was the property's sole owner, and Orrock never provided him an explanation. Over the next several years, Orrock made monthly payments to Bertha Astorga in mostly $5,000 increments from the Arville Properties account. He ultimately paid her about $250,000—almost $60,000 less than her one-third allocation.

In May 2011, just after the IRS issued notices of intent to levy on Orrock's accounts, he filed a 2007 tax return for Arville Properties.[46] Under the capital-gains section, Orrock listed the sale of the Arville Property but reported the sale price as just under $1.4 million and the property's basis—i.e., the purchase price—as almost $1.2 million (rather than the $80,000 Thompson actually paid for it). Orrock therefore reported the gain as about $200,000.

As for Orrock's personal tax return, he declared a tax liability of just under $23,000 for 2007, which reflected no income from the Arville Property sale.[47] Agent Blado testified at trial that over $914,000 from that sale is attributable to Orrock as income, which results in a tax

---

[44] ECF No. 241 at 8–9; ECF No. 43 at 14 n.12.

[45] Gov. Exh. 92.

[46] Gov. Exh. 33.

[47] Gov. Exh. 186.

16

liability of over $337,000.[48]  To arrive at the income figure, Blado began with the property sale price and deducted the total payments made to the Astorgas, the closing costs, the payment made to Thompson, and half of the judgment repayment.[49]  She explained at trial that this money constituted income to Orrock—rather than capital gains—because he never owned the property but retained much of the sale's benefits.  Blado also presented the jury with a diagram tracing the flow of funds after Orrock deposited the sale proceeds into the Arville Properties account.[50]  The funds flowed through much of Orrock's web of accounts, and Blado ultimately traced more than $30,000 from a Great White checking account being spent on personal purchases, including over $9,000 at restaurants alone.  Much of the funds, however, were untraceable because Orrock made cash withdrawals and repackaged the funds into hundreds of thousands of dollars worth of cashier's checks.

**B.      The evidence at trial overwhelmingly showed that Orrock personally benefitted from over $900,000 in sale proceeds from the Arville Property and willfully excluded an assessment for this income from his 2007 tax return.**

Count two charged Orrock with evasion of assessment (rather than payment) of tax under 26 U.S.C. § 7201.  This charge includes the same elements as count one but, as alleged, required the government to prove that Orrock owed more income tax for 2007 than he declared on his tax return.[51]  The government asserted—and the jury evidently agreed—that Orrock satisfied this element by failing to declare any of the income he derived from the Arville Property sale.

---

[48] Gov. Exhs. 184–85.

[49] Blado explained that she gave Orrock 50% credit because his brokerage firm and Thompson were held jointly-and-severally liable but Orrock paid off the entire judgment from Thompson's one-third share of the distribution—making the half Orrock owed income to him.

[50] Gov. Exh. 181.

[51] *See Kayser*, 488 F.3d at 1073 ("A tax deficiency occurs when a defendant owes more federal income tax for the applicable tax year than was declared due on the defendant's income tax return.").

17

In his new-trial motion, Orrock acknowledges that he distributed (through Arville Properties) a portion of the sale proceeds to one or more of his Great White entities.[52] But using the government's figures, Orrock provides new calculations that he contends demonstrate that the bulk of these funds were ultimately returned to Arville Properties by 2012.[53]

Even if these calculations are accurate, they don't detract from the conclusion that Orrock retained personal use of these funds and that they are thus taxable to him as income. After all, the only ostensible purpose for the Arville Properties company was to hold and manage the Arville Property, which was sold in 2007. And Orrock does not deny that Thompson, who was the property's sole legal owner, only received a small fraction of the sale proceeds. So, even if some portion of the proceeds returned to Arville Properties in 2008–12, it would be reasonable for the jury to conclude that Orrock nonetheless retained the benefit of these funds.

Similarly, there is no merit to his argument that, because Agent Blado could not trace the ultimate disposition of much of the sale proceeds, the government could not prove that Orrock personally benefitted from them. As discussed above, Blado traced tens of thousands of dollars to personal expenditures by Orrock from Great White accounts. As for the remainder of the funds, it would have been reasonable for the jury to infer that Orrock retained their benefit; none of the funds returned to Thompson, and Orrock controlled their flow through the intricate web of accounts that he created, pouring large sums through untraceable cashier's checks and cash withdrawals.

Orrock also argues that the IRS should not have treated any of the loans taken out against the property as income because the government could not prove that he received any of these

---

[52] ECF No. 260 at 10–11.

[53] *Id*. at 11–13.

18

funds. He contends that the $450,000 should have therefore been treated as a bad-debt deduction to Arville Properties. But Orrock took out the loans against Arville Property without Thompson's knowledge and consent and then paid off the amount from sale proceeds to which he was not entitled. So, it was reasonable for the jury to conclude that this money benefitted Orrock personally, especially considering the dearth of any evidence to the contrary.

There was therefore ample and compelling evidence at trial that Orrock owed far more in income tax than he declared for 2007. The jury also reasonably concluded that he acted willfully in omitting the income he gained from the Arville Property sale based on his knowledge and experience as both a tax attorney and real-estate broker, as well as his misrepresentations on the 2007 tax return for Arville Properties. So, I deny Orrock's motion for a new trial as to count two.

**Conclusion**

Accordingly, IT IS HEREBY ORDERED that Orrock's **motion for a new trial [ECF No. 260] is DENIED.**

Dated: June 13, 2019

_____
U.S. District Judge Jennifer A. Dorsey